**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re Application of the REPUBLIC OF TURKEY for an Order Under 28 U.S.C § 1782 to Conduct Discovery for Use in Foreign Legal Proceedings | Case No. 20 C 5012 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The Republic of Turkey, a sovereign nation, has filed an application for an order under 28 U.S.C. § 1782 to authorize service of a subpoena on fourteen respondents, a charter school management company and associated entities and individuals. Turkey seeks information that it says is relevant to a money laundering criminal investigation in Turkey. The respondents ask the Court to deny the application. For the following reasons, the Court denies Turkey's application.

## Background

According to the section 1782 application, the Republic of Turkey requests the assistance of the Court in obtaining information about Concept Schools NFP, a non-profit charter school management company that oversees thirty-one charter schools across the United States, including in Illinois and Ohio. Turkey contends that Concept, as well as shell companies and individuals associated with Concept, engaged in criminal offenses under U.S. law—procurement fraud, securities fraud, and wire fraud— to finance the international political activities of Fethullah Gulen, an exiled Turkish cleric

residing in the United States.  The respondents contend that Turkey's application is part of a campaign of political persecution against Gulen and his supporters and that the application is devoid of evidence that the Turkish authorities are conducting a legitimate criminal investigation.

Concept's activities have been the subject of U.S. law enforcement investigations, such as a 2014 False Claims Act investigation by the U.S. Department of Justice (USDOJ), which resulted in a civil settlement, and an FBI fraud investigation, which did not result in criminal charges; Concept has also attracted media attention based on its conduct.  *See, e.g.*, Dan Mihalopoulos, *Concept Schools charter chain to pay $4.5 million to end federal investigation*, Chicago Sun-Times (Nov. 6, 2020, 11:30 AM), https://chicago.suntimes.com/2020/11/6/21552520/concept-schools-charter-school-chain-investigation-settlement.  A 2019 audit report by Dave Yost, the Auditor of the State of Ohio, found certain conflicts of interest:  numerous individuals who served as board members for Concept-managed schools had overlapping roles as management leaders of Concept's business partners.  But there is no indication that either Concept or any of the other respondents have faced criminal charges here in the United States.

Turkey contends that the respondents' claimed criminal activities may give rise to violations of Article 282 of the Turkish Criminal Code, which makes money laundering an imprisonable offense.  Its theory is that if Concept or others affiliated with it committed crimes in the U.S. and then sent proceeds of those crimes to Turkey, it would violate Article 282.

There are fourteen respondents in this action, including Concept and charter

schools managed by Concept: (1) Concept Schools NFP; (2) Chicago Mathematics and Science Academy, Inc.; (3) Concept Schools NFP d/b/a Horizon Science Academy McKinley Park Charter School; (4) Concept Schools NFP d/b/a Horizon Science Academy Belmont Charter School; and (5) Concept Schools NFP d/b/a Horizon Science Academy Southwest Chicago Charter School. The respondents also include affiliated companies that were awarded vendor service contracts by Concept: (1) New Plan Learning, Inc., a non-profit organization formed by Concept personnel to purchase real estate that is leased to Concept's charter schools; (2) Quality Builders of Midwest, Inc.; (3) Design Furniture and Lab Systems, Inc.; (4) Maestro Corporate Group LLC; and (5) Signature Maker, Inc. Two financial institutions, JP Morgan Chase Bank N.A. and PNC Bank N.A., which possess financial documents concerning some of the respondents, are also named as respondents. Finally, two individuals, Edip Pektas, an Illinois citizen who held leadership positions at Concept schools while also serving as president of Quality Builders, an affiliated company to which Concept awarded contracts; and Ridvan Uysaler, an Illinois citizen who is Concept's chief financial officer, are named as respondents. Turkey proposes to subpoena Pektas and Uysaler for depositions.

Turkey alleges that corporate records, construction permits, and other public documents reflect that Concept engaged in corruption, namely insider dealing. For example, it alleges that Concept promised prospective investors that it would award major contracts through an open and competitive bidding process yet awarded multimillion-dollar contracts to favored vendors—"insider individuals and companies"—some of whom are respondents in this case. Pet.'s § 1782 Appl. at 2. According to Turkey, this evidence reveals Concept's practice of "divert[ing] funds away from their

intended purpose of educating this country's children"—in other words, children in the United States. Id. at 3. Further, Turkey contends that affiliated insider companies bought and sold real estate from Concept-managed charter schools at prices detrimental to the charter schools' financial well-being. It appears that Concept's claimed selection of favored technology vendors prompted the USDOJ's False Claims Act investigation, which ended in a civil settlement but no criminal charges. *See* Press Release, U.S. Dep't of Just., Office of Public Affairs, Illinois-Based Charter School Management Company To Pay $4.5 Million to Settle Claims Relating to E-Rate Contracts (Nov. 3, 2020), https://www.justice.gov/opa/pr/illinois-based-charter-school-management-company-pay-45-million-settle-claims-relating-e-rate.

Turkey also argues that the respondents improperly allocated federally funded school lunch program contracts—in violation of U.S. Department of Agriculture rules—to a catering company that shares the same home address as a Concept executive. Pet.'s § 1782 Appl. at 2-3. It also asserts that Concept is committing immigration and visa fraud "in order to generate illicit kickbacks and relocate Turkish supporters of Mr. Gulen into the United States." Id. at 3. Turkey argues that U.S. Department of Labor records indicate that Concept has sponsored hundreds of Turkish individuals for H-1B visas and permanent residence and that these persons are kicking back portions of their salaries to support Gulen. Based on these contentions, Turkey asks the Court to authorize issuance of subpoenas to the respondents to assist in a claimed criminal investigation in Turkey.

Turkey has submitted fourteen proposed subpoenas requesting depositions and document production—including Concept's vendor contracts and related operational

4

agreements, financial statements and transactions, employment records, and H-1B status and visa petitions. In support of its application, Turkey has submitted a declaration from Ankara's chief public prosecutor and a letter from the Turkish Ambassador to the United States; both of these documents describe a pending investigation into Gulen and individuals and entities affiliated with him. Turkey asserts that the discovery it seeks is necessary for the investigation. In opposition, the respondents argue that the discovery requests are overbroad, amount to harassment (for reasons the Court will discuss), and will impose significant burdens and costs on the respondents, which include multiple non-profit organizations and schools.

Turkey filed similar applications in the Southern District of Ohio and the Northern District of Ohio. On January 29, 2021, Judge Polster issued an order partially granting the Republic of Turkey's petition; that petition, which involved different respondents, was similar to the application before this Court but concerned Concept's activities in connection to its Ohio-based charter schools. Minute Order, *In re Appl. of the Republic Turkey*, No. 20 MC 85 (N.D. Ohio Jan. 29, 2021) (dkt. entry no. 11) (ordering respondents to "produce any all [sic] documents evidencing the flow of funds between respondent's schools and the Republic of Turkey or certify that no such documents exist"). On February 22, 2021, Magistrate Judge Deavers denied a similar application submitted by Turkey. *In re Appl. of the Republic of Turkey*, No. 20 MC 36, 2021 WL 671518 (S.D. Ohio Feb. 22, 2021).

## Discussion

Under 28 U.S.C. § 1782, a district court may authorize the production of documents or testimony for use in a foreign legal proceeding, unless the disclosure

5

would violate a legal privilege. 28 U.S.C. § 1782(a). Section 1782 requires a petitioner to show that: (1) the discovery is sought from a person residing in the district of the court to which the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the applicant is a foreign or international tribunal or an "interested person."

The U.S. Supreme Court's decision in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), is the leading authority on evaluating section 1782 applications. In *Intel*, the Supreme Court concluded that even if an application meets the statutory requirements under section 1782, the district court's decision to grant the application is discretionary. *Id.* at 255. A district court should assess the following factors in determining what discovery, if any, to allow:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding";
> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";
> (3) whether the discovery request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States";
> (4) whether the discovery requested is "unduly intrusive or burdensome."

*Id.* at 264-65. Section 1782 has "twin aims": "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Id.* at 252 (internal quotation marks and citations omitted).

### A. Statutory requirements

The Republic of Turkey contends that its application satisfies all three of section 1782's statutory requirements. First, the subpoenas seek discovery from several

respondents, all of whom reside or are found within this judicial district.  Second, it requests discovery assistance for use in a proceeding before a foreign tribunal.  Third, Turkey is an interested person within the meaning of the statute.  The respondents do not appear to dispute that the first and third statutory requirements are met, but they contend that Turkey's application does not satisfy the requirement that the discovery is for use in a proceeding before a foreign tribunal.  Resp. Mem. at 13.

1.  **Section 1782's "for use" requirement**

Turkey contends that it seeks the requested discovery "for use in an ongoing criminal investigation into various Turkish criminal offenses, including suspected money laundering activities."  Pet.'s § 1782 Appl. at 5-6.  The respondents disagree; they argue that Turkey's submissions are "devoid of evidence that could lead this Court to conclude that Turkish authorities are seeking discovery for use in a legitimate investigation into violations of Turkish law or that any formal accusation is reasonably contemplated."  Resp. Mem. at 1-2.  Rather, they contend, Turkey is actually seeking the requested discovery to harass and obtain information about purported Gulen followers.  *See id.* at 2.  In response, Turkey argues that the respondents are improperly seeking to "delegitimize the actions of a sovereign government" and that "the statement of the Ambassador and the declaration of the prosecutor responsible for this investigation more than satisfy th[e] [for use] requirement."  Reply Mem. at 5-6.  Turkey also contends that "[t]he actual proceeding need not be pending in order for a district court to grant discovery request [sic]."  *Id.* at 5.  "Rather, Section 1782 requires only that the use of the information be within 'reasonable contemplation' at the time of the request."  *Id.* (quoting *Intel*, 542 U.S. at 259).

7

Turkey is correct that under section 1782's "for use" requirement, "the foreign proceeding need not be pending, so long as it is 'within reasonable contemplation.'" *Mees v. Buiter*, 793 F.3d 291, 295 (2d Cir. 2015) (quoting *Intel*, 542 U.S. at 259). A number of courts have held that section 1782 permits the district court to provide discovery assistance for a foreign criminal investigation into violations of non-U.S. law by public prosecutors. *See, e.g.*, *In re Request for Assistance from Ministry of Legal Affs. of Trinidad & Tobago*, 648 F. Supp. 464, 466-67 (S.D. Fla. 1986), *aff'd* 848 F.2d. 1151 (11th Cir. 1988), *cert. denied*, 488 U.S. 1005 (1989) ("the pivotal inquiry this Court must make is whether the evidence sought will eventually be used in a proceeding in a foreign or international tribunal") (hereinafter *In re Trinidad & Tobago*); *United States v. Sealed 1, Letter of Request for Legal Assistance from the Deputy Prosecutor Gen. of the Russian Fed'n*, 235 F.3d 1200, 1205 (9th Cir. 2000) (section 1782 permits discovery for criminal investigations conducted before formal accusation); *In re Appl. for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 464 (2d Cir. 2014) ("28 U.S.C. § 1782 permits district courts to order the production of discovery for use in a foreign criminal investigation being conducted by an investigating [public prosecutor]").

Here, however, Turkey's application seems primarily directed at investigating violations of *United States* law. To be sure, it cites an inquiry into Turkey's money laundering statutes. But the entirety of the application before the Court focuses on activity undertaken *in the United States* and whether it violates the laws of this country.

In addition, the application does not provide any details regarding the nature of the purported criminal investigation in Turkey. The respondents argue that the

8

petitioner's failure to provide specific details about the investigation and how it plans to use the requested discovery forecloses it from satisfying the second statutory requirement. The Court finds the respondents' argument persuasive. Consider *In re Trinidad & Tobago*, in which the Eleventh Circuit upheld the district court's conclusion that the "for use" requirement was satisfied because Trinidad and Tobago's minister of legal affairs "set forth the documents he desired, the information he expected to find, and the reason he would use the documents in the eventual proceeding" when he "requested the [federal judicial] assistance." *In re Trinidad & Tobago*, 848 F.2d at 1155-56. In contrast, the Republic of Turkey's request for assistance in this case is based on vague and conclusory statements from two Turkish officials, as follows:

> This letter confirms that Law Enforcement Authorities of the Republic of Turkey are conducting various criminal investigations into Fetullah Gulen and his organization for suspected criminal activity.
>
> . . . .
>
> Specifically, Turkish authorities are investigating a scheme through which criminally derived funds are being laundered from certain corporations and individuals throughout the United States, and then returned to Turkey for the continued financing of illicit activities in violation of Turkish laws.

Turkish Ambassador Letter (dkt. no. 9); *see also* Ankara Prosecutor Decl. ¶¶ 3-6 (dkt. no. 35-1); *see In re Trinidad & Tobago*, 848 F.2d at 1155-56. The petitioner's application suggests that numerous investigations into "illicit activities" are underway in Turkey, but it offers nothing about what those claimed illicit activities are, nor does it offer any support for the proposition that these activities, whatever they are, are being funded by any of the respondents or others in the United States who are within the scope of the matters targeted by the section 1782 application. If this Court were to accept Turkey's application "at face value," its submissions may reflect "more of a

9

fishing expedition" into the respondents' financial activities "than a legitimate use of § 1782 to further pursuit of criminals." *See In re Appl. of Gov't of Lao People's Democratic Republic*, No. 15 C 00018, 2016 WL 1389764, at *6 (D. N. Mar. I. Apr. 7, 2016). And—though not necessary to the Court's decision in this case—taking such matters on faith would seem particularly imprudent given the claimed political overlay, specifically, the apparently undisputed proposition that Gulen and his followers are political opponents of the current government in Turkey.

In a similar matter filed by Turkey in the federal district court for the Southern District of Ohio, Judge Deavers noted that the petitioner's submissions—namely the Ankara prosecutor's declaration about the investigation—contained only "the most minimal information" and that "more detail and specifics would be expected." *In re Appl. of the Republic of Turkey*, 2021 WL 671518, at *7. The Court agrees.

For these reasons, the Court concludes that the Republic of Turkey's application falls short of satisfying section 1782's "for use" requirement. Nevertheless, because the parties do not appear to dispute that the first and third statutory requirements are satisfied, the Court will address the *Intel* factors based on an assumption that all three statutory requirements under 28 U.S.C. § 1782 are in fact met.

**B.**    ***Intel* factors**

Even if the statutory requirements are met, the Court's decision to grant a section 1782 application is a discretionary one. *Intel*, 542 U.S. at 247; *see Sealed 1*, 235 F.3d at 1205-06 (explaining that section 1782 "provides considerable discretion to district courts to decline to order U.S. authorities to assist in situations where the foreign government . . . is simply seeking to harass political opponents").

The respondents contend that the Turkish government is pursuing discovery through section 1782 "to identify, persecute, and harass purported Gulen followers" and therefore urge this Court to deny the application on the basis that Turkey seeks discovery in bad faith. Resp. Mem. at 24-25. It is conceivable, however, that Turkey's request for discovery of evidence that is claimed to support a finding of money laundering reflects a "good faith effort to elicit evidence that has probative value" in a pending Turkish criminal investigation. *See Chevron Corp. v. Shefftz,* 754 F. Supp. 2d 254, 262 (D. Mass. 2010). Nevertheless, the Court recognizes the seriousness of the allegation that Turkey is seeking discovery under section 1782 as part of a campaign to target or harass political opponents. In any event, as the Court explains below, the *Intel* factors weigh against granting Turkey's section 1782 application.

1. **Respondents' participation in foreign proceeding**

None of the respondents in this case are participants in the criminal investigations or any proceeding underway in Turkey. As a general matter, if "the person from whom discovery is sought is a participant in the foreign proceeding," then "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. This is because the foreign tribunal has jurisdiction over participants "and can itself order them to produce evidence." *Id.* "In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.* The respondents do not appear to challenge Turkey's contention that the first *Intel* factor is satisfied. The Court therefore accepts the assertion that the respondents "are all nonparties located

outside the jurisdictional reach of Turkish courts." Pet.'s § 1782 Appl. at 7. The first *Intel* factor thus weighs in Turkey's favor.

2. **Receptivity to U.S. judicial assistance**

Second, the Court "consider[s] the nature of the foreign tribunal, the character of proceedings underway abroad, and the receptivity of the foreign government, court, or agency to federal-court judicial assistance." *Intel*, 542 U.S. at 264. The Republic of Turkey is receptive to this Court's assistance, as evidenced by a letter authored by the Turkish Ambassador to the United States and a declaration from Ankara's chief public prosecutor. *See* Turkish Ambassador Letter; Ankara Prosecutor Decl. The respondents do not dispute that Turkey is seeking federal judicial assistance with discovery. *See Kardas v. Astas Holdings A.S.*, No. 19 MC 80174 VKD, 2019 WL 3365646, at *2 (N.D. Cal. July 25, 2019) ("The Court infers that the Turkish Court would not seek the assistance of the United States in obtaining these documents if the documents were within the reach of the Turkish Court's jurisdiction."). Thus, the second *Intel* factor weighs in Turkey's favor.

3. **Circumvention of proof-gathering restrictions**

In assessing the third *Intel* factor, the Court considers "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. The respondents argue that the Court should deny the petitioner's application because Turkey can collect evidence located in the United States for use in a foreign criminal investigation based on the mutual legal assistance treaty (MLAT) between Turkey and the United States. Resp. Mem. at 20 ("Typically, when a foreign government is seeking

evidence in the United States for use in a criminal investigation abroad, it will first request assistance from U.S. prosecutors through an established MLAT procedure."). Through the MLAT procedure, Turkey may submit a discovery request to the government of the United States, which then would be reviewed by the U.S. Department of Justice. If the USDOJ authorized the request, it would then petition a federal district court to issue subpoenas. 18 U.S.C. § 3512(a)(1). The respondents contend that the petitioner's bypass of the MLAT process is evidence of the improper purpose of its application. See Resp. Mem. at 20-24.

As Turkey points out, some courts assessing section 1782 applications have rejected similar arguments—that the petitioner's application should be denied for failure to exhaust other discovery options, such as bypassing the MLAT procedure. It is true that section 1782 does not incorporate an exhaustion requirement. See In re Veiga, 746 F. Supp. 2d 8, 24-25 (D.D.C. 2010) (rejecting argument that the applicants' section 1782 application should be denied for failure to obtain discovery in foreign tribunal); Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095 (2d Cir. 1995) ("Relying on the plain language of the statute, this Court has also refused to engraft a 'quasi-exhaustion requirement' onto section 1782 . . . .").

In this case, however, there is a legitimate basis for concern given the nature of the material sought. As the Court has indicated, what is happening here is that a foreign government is seeking to use the American civil legal process to investigate purported criminal activity supposedly undertaken in the United States—and, to boot, matters that authorities in the U.S. declined to prosecute criminally. Based on petitioner's description of Article 282 of the Turkish Criminal Code, it appears that

13

Turkey is investigating a "derivative" money laundering offense—conduct that is only a crime if the perpetrator committed a crime under the law of another country—in this case, U.S. law.  The facts of this application reflect the exact scenario contemplated by the MLAT, which facilitates requests for legal assistance in foreign criminal cases.  The petitioner's only explanation for avoiding the MLAT process is that it is not required to do so, and the process is cumbersome.  The explanation is not persuasive.  In the Court's experience, the MLAT process likely would have been conducted, at least at the outset, *ex parte*, that is, without the participation of the respondents.  *See United States v. Trustees of Bos. Coll.*, 831 F. Supp. 2d 435, 451 (D. Mass. 2011) ("individuals are . . . precluded from challenging the propriety of MLAT requests"); *In re Grand Jury Subpoena*, 646 F.3d 159, 165 (4th Cir. 2011) ("MLAT [does not] give[] rise to a private right of action that can be used to restrict the government's conduct").  That is the opposite of cumbersome, particularly when compared with the way Turkey chose to proceed, which involved providing notice to the respondents, followed by adversary briefing and argument.  This provides some support for the view that Turkey proceeded as it did because it *did not want* its application scrutinized by U.S. prosecutorial authorities.

For these reasons, the Court concludes that the application reflects an attempt to circumvent an applicable proof-gathering process.  In reaching this conclusion, the Court points to the following passage from the federal district court for the Southern District of New York's decision in *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, No. 20 MISC. 209 (PAE), 2020 WL 6547902 (S.D.N.Y. Nov. 6, 2020), which is instructive and persuasive:

> To be sure, there is no principle of law compelling a foreign nation seeking evidence in this country for use in a criminal case to proceed first via an MLAT. But there are sound reasons for generally channeling such discovery applications through the MLAT process. Doing so promotes comity and consistent outcomes as to such requests, adds protection for the domestic entities from whom discovery is sought by foreign prosecutors and criminal investigators, and assures that the U.S. government's expertise and analytic rigor is applied to the application, including to assure that the discovery is not sought for ulterior (non-prosecutive) ends.

*Id.* at *7-8 (citation omitted). The Court also finds Judge Deavers's conclusion persuasive: "Turkey simply has not set forth a reasonable justification for choosing to bypass the MLAT-review procedure under the circumstances here." *In re Appl. of the Republic of Turkey*, 2021 WL 671518, at *12. In short, the third *Intel* factor weighs against granting Turkey's application.

### 4. Unduly burdensome or intrusive discovery

Discovery requested pursuant to section 1782 "may be rejected or trimmed" if the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. Pursuant to its "considerable" discretion, the district court may reject discovery requests that seek overly broad categories of documents and other evidence rather than specific categories of documents. *See In re Appl. for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding*, No. 17 1466 (BAH), 2017 WL 3708028, at *4-5 (D.D.C. Aug. 18, 2017); *In re Appl. of Degitechnic*, No. C07 414 JCC, 2007 WL 1367697, at *5 (W.D. Wash. May 8, 2007).

In their response brief, the respondents contend that the discovery requests are unduly burdensome and intrusive because they cover nearly every financial record from the past fifteen years from five respondents and all employee records from seven respondents, among other documents, and that this would require the respondents,

many of whom are non-profit entities, to review hundreds of thousands of documents. Resp. Mem. at 25-29. Respondents' point was well taken. It also sought information relating to H-1B visa applications. The requests, as written, had the appearance of a fishing expedition well beyond the claimed legitimate purpose of the Turkish criminal investigation.

In response to this argument, Turkey, in its reply memorandum, modified all but one subpoena. Reply Mem. at 11-12. The modifications included limiting the time period of some of the requests to five years as opposed to fifteen. (Others, however, retained their original fifteen-year scope—the requests regarding Chicago Math & Science Academy, Horizon Science Academy (McKinley), Horizon Science Academy (Southwest), and Horizon Science Academy (Belmont).) Turkey also proposed to increase the monetary thresholds applicable to requests for documents relating to the respondents' financial transactions and agreements. For example, it initially sought documents regarding any vendors who received payments totaling over $5,000 in a given year, but the petitioner modified its request to payments totaling over $100,000 to any vendor in a given calendar year, or in some cases, over $25,000 in a given calendar year.

Despite these limited proposed modifications, Turkey's requests are extremely broad and, again, are suggestive of a fishing expedition and, perhaps, a purpose beyond simply investigating potential money laundering in Turkey.

The modified proposed subpoena for Concept, for example, asks for five years of documents associated with payments to vendors involving more than $100,000 in a calendar year; documents reflecting the identity of vendors who received payments of

16

more than $25,000 in a calendar year; all board of directors meeting agendas and minutes; extensive information regarding H-1B visa requests; and other matters, such as information on financial transactions in excess of $1,000 to or from organizations or individuals located outside of the United States over a ten-year period. *See* Concept Schools NFP Modified Subpoena at 4-5 (dkt. no. 54-2). Similarly, the proposed modified subpoena for New Plan Learning covers all board of directors meeting agendas and minutes, information related to a municipal bond starting from 2011, and significant information from 2015 to the present, including H-1B visa information, leases and lease agreements, and records associated with the "sale, purchase, or lease of any property to or from any charter school managed by Concept Schools." *See* New Plan Learning Modified Subpoena at 5 (dkt. no. 54-2). Next, with respect to the proposed modified subpoena for Quality Builders of Midwest, Turkey seeks documents and information going all the way back to 2010, regarding compensation paid to certain Concept leaders as well as contracts, bids, invoices and other records associated with construction and other services to Concept schools. And finally, the proposed modified subpoenas for individual charter schools, request, going back to 2015, documents and information related to vendor payments that exceed $100,000 in a calendar year, documents and information reflecting the identity of vendors paid more than $25,000 in a calendar year, H1-B visa-related information and documents, lease agreements, property purchase agreements, and employee information; board of directors meeting agendas and minutes, with no specific time period mentioned; and documents reflecting transactions in excess of $1,000 "to or from organizations or individuals located outside of the United States" over a ten-year period. *See* Horizon Science Academy Belmont

Charter School Modified Subpoena at 4-5 (dkt. no. 54-2).

Simply put, these requests are fairly characterized as "sweeping." *In re Appl. of Auto-Guadeloupe Investissement S.A.*, No. 12 MC 221, 2012 WL 4841945, at *9 (S.D.N.Y. Oct. 10, 2012); *see In re Appl. of OOO Promnefstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding*, No. M 19-99, 2009 WL 3335608, at *4, *9 (S.D.N.Y. Oct. 15, 2009), *abrogated on other grounds by In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019) (describing "sweeping" section 1782 request).

The Court assesses independently whether the requests, as modified, are overly burdensome. *See Intel*, 542 U.S. at 265. Even considering the modifications, the requests, given their breadth, are likely to impose a heavy burden, particularly on the not-for-profit entities and individuals targeted by Turkey's requests. And they remain significantly intrusive, in particular with respect to requests that the individual charter schools and Concept produce all documents, forms, notices, and other records concerning H-1B status and visa petitions from 2015 to the present. These requests, in particular, are suggestive of an effort to identify Turkish nationals working for or with Concept, not criminal activity related to money laundering. For at least these reasons, the requests do not appear to be in any way tailored to the legitimate needs of an actual criminal investigation. For these reasons, and given the rather opaque description by Turkey of the nature of the underlying criminal investigation, the Court concludes that the fourth *Intel* factor weighs against granting the application.

In sum, after weighing the *Intel* factors, the Court concludes that granting the application would not be appropriate even if Turkey met the statutory requirements of 28 U.S.C. § 1782.

**Conclusion**

For the foregoing reasons, the Court denies the petitioner's application under section 1782 to pursue discovery for use in foreign proceedings [dkt. no. 1].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 16, 2021